NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0713n.06

No. 09-2399

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Oct 14, 2011*

LEONARD GREEN, Clerk

MARCIA O'CONNOR,                            )
Personal Representative of the Estate of    )
Mitchell T. Prybyla, Deceased,              )
                                            )        ON  APPEAL  FROM  THE
        Plaintiff-Appellant,                )        UNITED  STATES  DISTRICT
                                            )        COURT FOR THE WESTERN
        v.                                  )        DISTRICT OF MICHIGAN
                                            )
COMBINED  INSURANCE  COMPANY  OF            )
AMERICA,                                    )
                                            )
        Defendant-Appellee.

_____

BEFORE: MERRITT, ROGERS, and WHITE, Circuit Judges.

ROGERS, Circuit Judge. Plaintiff Marcia O'Connor seeks to recover on insurance policies

insuring the health of her since-deceased son, Mitchell Prybyla. Although the policy applications

identify Prybyla as the insured and as the applicant for insurance, and the applications contain

purported signatures of Prybyla in those capacities, the policies were in fact obtained by Prybyla's

friend without Prybyla's knowledge or approval. Because there was no meeting of the minds

between contracting parties and therefore no valid insurance contract existed, the district court

properly granted summary judgment to the defendant Combined Insurance Company of America.

For about a year up to August of 2005, Mitchell Prybyla and Janet Blair were tenants in the

same house, where they shared rental expenses but were not romantically involved. Prybyla and

Blair handled their own finances separately. In early August 2005, Prybyla became ill; he did not

have health insurance. When in mid-August the landlord sold the house in which they were living, Blair decided to move to another place and Prybyla decided to move to the home of his mother, plaintiff Marcia O'Connor.

On the morning of August 21, 2005, Blair worked until approximately 3:00 p.m. and then went home to pack for the move. Blair did not see Prybyla at all that day and the two did not sleep under the same roof that night. When Blair arrived home from work, two friends were already at the house to help Blair pack. Kimberly Costello, with whom Blair had worked at a local restaurant years before, was also at the house. At the time, Costello was a licensed insurance agent for Combined Insurance. Blair and Costello were not friends and had not seen each other for "a really long time." Costello had a clipboard and her insurance materials with her.

According to Blair, Costello "just came right out" and asked Blair if Prybyla had any insurance. Blair could not remember if anything specific prompted this question. According to Costello, she had her insurance kit with her because she was working on an award; to get the award, she needed to sell one more sickness policy and one more cancer policy. Costello indicated that the subject of Prybyla not having insurance came up because Blair thought that Prybyla had the flu and mentioned this to Costello.

Blair answered Costello that Prybyla did not have health insurance. Prior to August 21, 2005, Prybyla had never discussed the issue of insurance with Blair, had not asked Blair to obtain insurance for him, and had not given Blair a power of attorney or other authorization to act on his behalf. Blair asked Costello how she could buy insurance policies for Prybyla if Prybyla was merely her friend; Costello told Blair that this was not a problem. Costello also told Blair that the insurance policy applications could be completed despite Prybyla's absence, and explained that she would fill out the

2

applications for her. Blair agreed to purchase several insurance policies and Costello subsequently prepared applications for two "sickness only" insurance policies and one "cancer only" insurance policy for Prybyla.

Blair was designated as the beneficiary under each of the policies, with her relationship to Prybyla described as "friend," but she did not recall discussing this specific issue with Costello. The policies required the applicant to affirm that the insured was not covered by Medicaid, but Blair stated that Costello never asked her whether Prybyla was eligible for Medicaid coverage. Nevertheless, the applications were completed in full and the information included in the applications was correct, according to Blair. Blair stated that she observed Costello writing on her clipboard while Blair was moving throughout the house packing and that she believed that Costello was filling out the applications during that time.

Each of the two sickness insurance policy applications required one signature from the applicant and one from the principal insured. The first signature certified that the applicant had read a policy qualification statement and that this statement was "true to the best of his or her knowledge and belief." The second signature acknowledged the applicant's receipt of the policy and outline of coverage. On the two sickness policies, Prybyla's printed name is given as both the insured and the applicant, and what purports to be his signature is written as the applicant on each form's acknowledgment lines. The cancer policy required two signatures by the "principal insured." On the cancer policy, Prybyla's printed name is given as the insured and his name is written on both acknowledgment lines. In total, the three applications contained six separate signatures purporting to be those of Mitchell Prybyla.

It is undisputed that Prybyla was not present when the insurance policy applications were prepared, and that he therefore could not have completed any of the applications, made the appropriate acknowledgments with respect to the policy qualification statements, or signed any of the applications. Blair asserted that Costello never asked her to sign Prybyla's name on the applications and that she did not know who signed Prybyla's name. Each application also required a signature from the licensed resident agent; Costello's signature was therefore present on every application. Blair wrote a check for the initial premium payments on the three policies and signed a form directing that subsequent payments be automatically deducted from her checking account.

The next day, August 22, 2005, Prybyla's condition worsened. Prybyla was airlifted to a hospital, where Prybyla was diagnosed with acute lymphoblastic leukemia. Prybyla remained hospitalized there until September 16, 2005. During this time period, neither Prybyla nor O'Connor (his mother) knew that Blair had purchased insurance policies in Prybyla's name. According to O'Connor, Blair first told her about the policies during a telephone conversation in September 2005. Blair testified that she informed Prybyla of the insurance policies some time after September 2005, when she drove Prybyla back to the hospital for treatment. According to O'Connor, this trip took place in March 2006, although O'Connor believed that Prybyla learned of the policies before then.

Blair later said that when she purchased the insurance policies, she did not understand that she had to file a claim in order to receive benefits. Instead, she believed that the benefits would "come automatically to Mitch," and that Costello "was taking care of it because she was the agent." Around October 2005, after Prybyla had left the hospital, Costello gave Blair a claim form and explained that Prybyla could obtain payment under the "cancer only" policy once the form was

4

completed and submitted. Costello completed and submitted the claim form for Blair once Blair provided Costello with Prybyla's hospital bills and receipts.

On January 20, 2006, Blair called Combined Insurance regarding the claim's status and spoke with representative Kathy Karall. Karall was suspicious of the selection and purchase of the policies only a day before Prybyla was diagnosed with cancer. Blair told Karall that she was not sure whether Prybyla's illness had been diagnosed on August "20th or the 19th or 18th," placing the date of diagnosis prior to the date on which the insurance policies were applied for. Blair also indicated that Prybyla had signed the applications. Based on the circumstances surrounding the policies' issuance, Karall stated that Combined Insurance would have to investigate the insurance claim. Karall requested that Prybyla submit an authorization form and provide her with additional information about his medical circumstances.

Over the next several months, Karall spoke with Blair and O'Connor in an attempt to learn the circumstances surrounding the issuance of the insurance policies.[1] On July 26, 2006, Karall told O'Connor that she wanted an update on Prybyla's condition and mentioned that she had been unable to get in touch with Blair. O'Connor informed Karall that she had told Blair to stop dealing with Combined Insurance. Karall stated that Combined Insurance was conducting a routine investigation. Karall told O'Connor that she would provide questions regarding the claim for Prybyla and Blair to answer, but Karall apparently never provided O'Connor with these questions.

---

[1] In May 2006, Blair cancelled the automatic premium deduction and stopped paying premiums on the policies. O'Connor testified that she recalled seeing what appeared to have been notices sent by Combined Insurance to Prybyla regarding the lapse of the insurance policies. These notices offered to let Prybyla reinstate the policies. Neither O'Connor nor Prybyla ever attempted to pay the premiums or reinstate the policies and the policies were therefore treated as lapsed as of May 21, 2006.

On August 8, 2006, Karall wrote O'Connor to follow up on their earlier conversation, stating that Karall would need O'Connor's, Blair's, and Prybyla's statements "in order to determine our liability on [Prybyla's] claim." O'Connor wrote back to inform Karall that O'Connor would be unable to provide these statements because she was too busy helping Prybyla prepare for a bone-marrow transplant. O'Connor asked Karall "to wait until we further notify you of our availability and hire an attorney to handle our case, if and when we choose to proceed with the claim."

Prybyla passed away on March 31, 2007. O'Connor wrote Karall on November 4, 2007 to notify her of Prybyla's death, and provided Karall with a copy of Prybyla's most recent hospital admission dates. O'Connor requested a copy of the "cancer only" policy, and asked Karall to update her on the status of Prybyla's claim and to tell her if anything else was needed to process the claim. Several months later, O'Connor consulted a family friend, attorney John Higgins, who called Karall in July 2008. Higgins told Karall that he represented Prybyla's estate. Higgins threatened a lawsuit over the insurance claim, arguing that Costello had wrongfully backdated the insurance policies.[2] Higgins also informed Karall, for the first time, that Prybyla was not actually present when the policies were applied for in his name. During a later conversation, Karall told Higgins that Prybyla's case had been closed for some time. Higgins informed Karall that he was "going forward with a cause of action" based on his understanding that Prybyla had a valid "cancer only" policy from Combined Insurance and that the company refused to pay Prybyla's claim only because certain individuals refused to cooperate with Combined Insurance's investigation.

---

[2]Although this "backdating" theory—which suggested that Blair obtained three insurance policies for Prybyla after he was diagnosed with acute leukemia and that Costello backdated the policy applications to indicate that they were completed prior to this diagnosis—was initially advanced by O'Connor, she subsequently withdrew it in light of information provided during discovery. On appeal, neither side discusses or relies upon this theory.

O'Connor filed suit against Combined Insurance on behalf of Prybyla's estate on October 28, 2008.[3] On November 4, 2008, approximately one week after O'Connor filed suit, Karall wrote to Bruce M. Bieneman, the attorney representing O'Connor, to advise him that the three insurance policies were being rescinded due to Higgins's representations that the policies were backdated. Combined Insurance subsequently moved for summary judgment. At the hearing on this motion, the district court ruled that none of the insurance contracts "were actually formed lawfully at the inception date." It reasoned that "both parties to a contract have a right to know before they form a contract . . . who the parties to the contract actually are." Here, "somebody [was] masquerading as []Prybyla without his knowledge, consent, or authority" and "the party whose successor seeks to enforce [the contracts] in this case . . . could [not] possibly have had an intent to form a contract." The court further determined that "you couldn't, from these documents believe that []Blair ever formed a contract here either, or for that matter any third person, because whoever signed it is entering and appearing behind the identity of Mitchell Prybyla," and therefore there was "no possibility of an enforceable [contract] here, either with respect to the sickness polic[ies] or the cancer policy." Finally, although this point was "not essential to the [c]ourt's ruling in this case," the district court found that Blair had no insurable interest in the subject matter of the insurance policies "because under no scenario . . . can she ever be responsible for the . . . medical expenses [Prybyla] would incur."

Although the district court determined that it did not need to reach the issue of whether there was a misrepresentation that was sufficient to void an otherwise valid contract of insurance under

---

[3]At her deposition on February 24, 2009, Blair—who had made each of the premium payments—executed a release of any and all claims she may have had against Combined Insurance.

MCL § 500.2218, the court nonetheless concluded that "as a matter of law[,] . . . the material misrepresentation is there in any application that falsely represents an applicant to be someone who they are not or falsely represents the named insured to have signed when in fact [he] didn't." At the conclusion of the hearing, the district court granted defendant Combined Insurance's motion for summary judgment. On the following day, October 22, 2009, the district court issued an order memorializing this decision and dismissing O'Connor's claims. O'Connor appeals.

Summary judgment was proper. No valid contract was entered into between Prybyla and Combined Insurance because they lacked the requisite "meeting of the minds" necessary to form a contract. Under Michigan law, which governs the disposition of this case, "[a] contract of insurance rests upon and is controlled by the same principles of law applicable to any other contract. What the contracting parties intended, mutually agreed to, and their minds met upon, is the measure of their obligations." *Smiley v. Prudential Ins. Co. of Am.*, 32 N.W.2d 48, 50 (Mich. 1948). "[A] fundamental tenet of all contracts is the existence of mutual assent or a meeting of the minds on all essential terms of a contract." *Burkhardt v. Bailey*, 680 N.W.2d 453, 463 (Mich. Ct. App. 2004). "It is axiomatic that a party cannot consent to terms of which it is unaware." *In re Brown*, 287 B.R. 676, 682 (E.D. Mich. 2001).

Though Prybyla's signature appears on all three of the insurance applications, listing him as the insured and applicant, it is uncontested that Prybyla was not present at the time the insurance applications were signed in his name. Thus, Prybyla's name was signed to the applications by someone else, presumably either Blair or Costello. It is also uncontested that Prybyla never authorized either Blair or Costello to apply for insurance on his behalf. Since Prybyla never applied for any of the insurance contracts, either personally or through an authorized agent, Prybyla never

8

agreed to be a party to or to be bound by the insurance contracts.[4] That being the case, there could never have been any meeting of the minds between Prybyla and Combined Insurance with respect to any element of the insurance contracts. Without this requisite meeting of the minds, no contract existed under which O'Connor can bring claims on behalf of Prybyla's estate.

O'Connor's alternative basis of relief, under the second count of her complaint, is that Blair can be viewed as the actual party to the insurance contracts instead of Prybyla, and that Prybyla is instead the intended third-party beneficiary of the contracts. The district court, however, correctly rejected this third-party beneficiary theory. Blair plainly cannot be viewed as the actual party to the insurance contracts, as the face of the policies in no way indicates Blair's status as a contracting party. Blair's signature never appears on the policies; her printed name is only listed as the policies' beneficiary. The only signatures appearing on the policies are those of Prybyla (purportedly) and Costello. Prybyla's name is signed and printed as the applicant and/or the principal insured. Viewing these policy applications can only give the impression that Combined Insurance was contracting with Prybyla alone and, as already discussed, there could be no valid contract with Prybyla since there was no meeting of the minds between Prybyla and Combined Insurance. Because Blair cannot be considered a contracting party, there were no insurance contracts entered into between her and Combined Insurance upon which O'Connor can base her claim of third-party-beneficiary recovery.

O'Connor argues that contract law's meeting-of-the-minds requirement is rendered inapplicable by a Michigan statute, MCL § 500.2218. This statute provides, in relevant part, that

---

[4]At oral argument, counsel for O'Connor also disclaimed any theory that Prybyla agreed to the contracts via ratification.

"[t]he falsity of any statement in the application for any disability insurance policy . . . may not bar the right to recovery thereunder unless such false statement materially affected either the acceptance of the risk or the hazard assumed by the insurer," *id.* § 500.2218, and that "[n]o misrepresentation shall avoid any contract of insurance or defeat recovery thereunder unless the misrepresentation was material," *id.* § 500.2218(1). A misrepresentation[5] is deemed material if "knowledge by the insurer of the facts misrepresented would have led to a refusal by the insurer to make the contract." *Id.* § 500.2218(1); *see also Oade v. Jackson Nat'l Life Ins. Co. of Mich.*, 632 N.W.2d 126, 131 (Mich. 2001) ("a fact or representation in an application is 'material' where communication of it would have had the effect of 'substantially increasing the chances of loss insured against so as to bring about a rejection of the risk or the charging of an increased premium'"). O'Connor argues that Combined Insurance did not make the requisite showing under this statute—that there was a false statement in the policy application which materially affected the acceptance of risk by the insurer.

The argument is without merit. MCL § 500.2218 is a modification of the misrepresentation defense that only applies to otherwise valid contracts; it did not displace the underlying meeting-of-the-minds contract requirement. The statute explicitly contemplates avoidance of insurance *contracts*: "No misrepresentation shall avoid any contract of insurance or defeat recovery thereunder unless the misrepresentation was material." *See id.* § 500.2218(1). By the very terms of the statute there has to be a contract to avoid. Since no valid contract was ever formed between Prybyla and Combined Insurance in the first place, MCL § 500.2218 never comes into play at all and O'Connor's argument concerning the statute is without merit.

---

[5]"A representation is a statement as to past or present fact, made to the insurer by or by the authority of the applicant for insurance or the prospective insured, at or before the making of the insurance contract as an inducement to the making thereof." MCL § 500.2218(2).

The judgment of the district court is affirmed.

**HELENE N. WHITE**, Circuit Judge, dissenting. I respectfully dissent. In concluding that the district court correctly granted summary judgment in favor of Combined Insurance because no valid contract ever existed between Combined Insurance and Prybyla, the majority focuses on the fact that Prybyla never applied for any of the insurance policies, either personally or through an authorized agent. However, the essential elements of a contract were otherwise present. All parties had the capacity to enter into contracts. The terms of the insurance policy offered by Combined Insurance were accepted, the consideration was paid, and a policy was issued. The material facts – the identity and history of the insured – were accurately represented in the application and accurately made part of the contract. That Costello signed Prybyla's name in his absence and that Prybyla did not learn of Blair's fortuitous generosity until later is immaterial to the essential terms of the contract. It begs the question to say that a contract was not formed because Prybyla was not present so could not have had a "meeting of the minds" with Combined Insurance, and that the contract stated Prybyla was the applicant, not Blair, so no contract could have been formed between Blair and Combined Insurance. The question is whether these circumstances preclude the formation of a contract when the essential elements are otherwise present. Further, although Prybyla was not present when the "cancer only" policy application was completed and did not authorize Blair or Costello to complete it on his behalf, Prybyla could still have ratified this contract by accepting the benefits, thereby making it valid.[1]

It could be argued that by signing Prybyla's name on the application, Costello committed forgery under Michigan law. *Bank of Detroit v. Standard Accident Ins. Co.*, 245 Mich. 14, 21, 222

---

[1]The majority accurately states that counsel for O'Connor stated that he did not assert ratification. Nevertheless, the essence of O'Connor's argument is that Blair made a contract for Prybyla that Prybyla and O'Connor accepted.

12

N.W. 134, 136 (Mich. 1928) ("It is the essence of forgery that one signs the name of another to pass it off as the signature or counterfeit of that other.") (citations and internal quotations omitted). A party who establishes that a contract is based on forgery is entitled to have it voided due to a lack of mutuality of agreement.[2] *See Carpenter v. Camp*, 52 Mich. 375, 379, 18 N.W. 113, 115 (Mich. 1884); *see also Hawk v. Gen. Am. Life Ins. Co.*, No. 86-CV-74718-DT, 1987 U.S. Dist. LEXIS 15498, at *4-5 (E.D. Mich. Nov. 3, 1987) ("Either Louise Hawks signed the application or she didn't. If she didn't actually sign the application, i.e.[,] her signature was forged, then there is clearly no contract of insurance which the insurer would be obligated to honor.").

However, "[w]here the unauthorized signing of another's name to an instrument does not constitute the crime of forgery, the party whose name was so signed may ratify the signature and become bound thereby." 3 Am. Jur. 2d Agency § 188 (2010); *see also First Nat'l Bank of Durand v. Shaw*, 149 Mich. 362, 366, 112 N.W. 904, 905 (Mich. 1907) ("There can be no serious doubt that forgery of a negotiable instrument, or the indorsement thereon, *except in case of ratification or estoppel*, nullifies the instrument as to all parties against whom the forgery is committed.") (emphasis added).

Although Costello signed Prybyla's name on the insurance application, it appears that neither she nor Blair acted with the intent to defraud Prybyla or Combined Insurance. *See People v. Warner*, 104 Mich. 337, 340, 62 N.W. 405, 406 (Mich. 1895) ("The common-law definition of 'forgery' is 'a false making, or a making malo animo of any written instrument with intent to defraud.'"). The

_____

[2]Some cases also suggest that "[e]ven in the absence of any intent on the part of the insured to deceive the insurance company, the insurer may avoid the contract if a palpable fraud has been perpetrated upon it by its agent." *Fakhouri v. Banner Life Ins. Co.*, 157 F. Supp. 2d 751, 757 (E.D. Mich. 2001) (quoting *Henson v. John Hancock Mutual Life Ins. Co.*, 261 Mich. 693, 697, 247 N.W. 102 (Mich.1933) (additional citation omitted).

majority does not address the issue whether Blair or Costello intended to defraud Prybyla or Combined Insurance. Indeed, it appears that Blair was simply purchasing insurance coverage for her friend.

Numerous Michigan decisions have upheld contracts that were signed by those having no authority to do so, but that were later ratified. *See, e.g.*, *Leslie v. Kennedy*, 249 Mich. 553, 556-57, 229 N.W. 469, 470 (Mich. 1930) ("[Carrier] had no authority and no legal right to sign Henley's name to the contract and assignment. But he personally gained nothing by doing so . . . . The defendants have ratified such act, and by their consent, indorsed upon the assignment, have secured to plaintiff an enforceable contract . . . .We see no reason why he should be permitted in a court of equity to rescind the contract for this reason.").

Here, the invalidity of the contract rests with its execution and not with its subject matter. As a result, Prybyla could have ratified the contract, thereby making it valid. The record is unclear regarding whether Prybyla specifically ratified the contract, as there is conflicting testimony concerning when he learned of the existence of the policies and the actions he subsequently took with respect to the policies. On the other hand, Blair, presumably with O'Connor's and Prybyla's knowledge, filed a claim pursuant to the policy in order to get benefits for Prybyla, and O'Connor repeatedly followed up with Combined Insurance regarding the claim. Further, Combined Insurance continued to accept payments from Blair for all three policies until they lapsed, thereby potentially evincing its own ratification of the contract. Thus, there are genuine issues of material fact as to whether Prybyla (and Combined Insurance) ratified the contract at issue.

Michigan Compiled Laws § 500.2218 also dictates that summary judgment be denied. The statute does not permit Combined Insurance to invalidate the contract because a false signature on

an insurance-policy application does not in itself constitute a material misrepresentation under § 500.2218. Examples of material misrepresentations include misrepresentations regarding whether an applicant for health insurance "has not had previous medical treatment, consultation or observation, or has not had previous treatment or care in a hospital or other like institution." Mich. Comp. Laws § 500.2218(4). Here, although the signature on the application was not Prybyla's, he was the intended insured under the policy. Thus, the falsity of the signature would not have affected the risk assumed by Combined Insurance, where the remaining information in the application was correct. Additionally, the public policy expressed in 500.2218 should not be avoided on the basis that a contract was not formed. An application was submitted and a policy was in effect. This is precisely the situation 500.2218 is intended to address.

Because there remain genuine issues of material fact with respect to contract formation and ratification, as well as the nature of the misrepresentations, I would reverse the grant of summary judgment to Combined Insurance and remand for further proceedings.